**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **BOARD OF EDUCATION** | * | |
| **OF MONTGOMERY COUNTY** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | |
| | * | **Civil No. PJM 06-169** |
| **MATTHEW GRIFFIN, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## OPINION

Pursuant to the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1400 *et seq.*, an Administrative Law Judge ("ALJ") has ordered Montgomery County, Maryland, Board of Education to pay for a residential placement for Matthew Griffin, including tuition, room and board, all non-medical related services and costs and medical costs related to diagnosis and evaluation. The Board appeals.

## I.

Matthew, age 16, suffers from Obsessive Compulsive Disorder (OCD), characterized by fears and rituals that consume every aspect of his life each day throughout the entire day. His OCD primarily involves severe contamination issues, consisting of rituals of avoidance and cleaning. Either he avoids certain hygienic tasks such as brushing his teeth or showering or he performs them to the point of exhaustion and physical mutilation. His complete current diagnosis is severe and refractory OCD, Pervasive Development Disorder, Tic Disorder, psychotic disorder, Sensory Integration Dysfunction, low muscle tone and depression. In addition to contamination OCD,

Matthew suffers from "just right" OCD, symmetry OCD and scrupulosity OCD.[1]  His condition is

so severe that it prevents him from functioning within a basic daily routine, performing self-care

tasks, attending school, leaving the house or interacting appropriately with family members.

Matthew was first evaluated in July of 2002.  His intellectual functioning was determined

to be within the high average range, although he was also found to be struggling with anxiety and

depression.  For the 2002-2003 school year (sixth grade), he was enrolled in school in Canada, but

was unable to attend due to his perceptions about contaminants.  In April 2003, he was hospitalized

in Canada for OCD.  According to his parents (the Griffins), following that hospitalization, Matthew

was institutionalized at the Royal Hospital of Ottawa, where he lived in a cottage setting and spent

his days doing schoolwork with a special education teacher, going home on Wednesday afternoons

and weekends.

During December 2003, while in Canada, Matthew's symptoms worsened and he remained

out of school.  In March 2004, after hospitalization at both the Children's Hospital in Canada and

at the Children's National Medical Center in Washington, D.C., he was admitted to the Children's

National Medical Center Psychiatric Day Treatment Program in Rockville, Maryland for monitoring

and stabilization of his OCD.

In May 2004, Matthew entered the adolescent OCD disorder unit at Menninger Clinic

("Menninger") in Houston, Texas, where his OCD was rated as extremely severe.  In addition to

aggressive medication management, Menninger created an intensive individualized cognitive-

---

[1]

These terms are used in a non-technical sense and are specific to Matthew.  The "just right"
OCD and symmetry OCD refer to Matthew's efforts to organize everything so that it is "right," even
in the home.  Scrupulosity OCD is a system personal to Matthew as to what is sinful and what is
sacred.

behavior therapy plan for Matthew involving exposure response therapy.  While at Menninger, Matthew was able to attend some school through an arrangement Menninger had with the local public school district, Spring Branch Independent School District, which provides a school on Menninger's grounds.  Matthew took eighth grade English, math and history and performed well academically.

The termination of the Griffins' medical insurance ended Matthew's stay at Menninger. Despite showing appreciable improvement while there, Matthew still had difficulty using public toilets, tolerating school or washing and showering.  His biggest challenges at the time of his discharge from Menninger were his continuing struggles with rituals and his need to "feel right."

In October 2004, Matthew returned to Montgomery County, Maryland.  According to an educational evaluation made that month, Matthew demonstrated no learning disabilities and his academic achievement continued to be in the high average range.  The evaluation concluded that any deficiency in Matthew's academic achievement was correctable by regular and compensatory education.  A small, structured educational environment was recommended that would provide Matthew with one-on-one and small group instruction.  The evaluation did not suggest a residential placement.

Subsequently, an Individualized Education Plan (IEP) team meeting was convened.  The team found Matthew eligible for special education services, again determining that his academics fell within the high average range of achievement.  His needs were found to be attention, social interaction including non-verbal communication, transitions between tasks, adapting to new environments, unstructured activities and social information processing.  His behavioral therapist at Menninger, Dr. Thröstur Bjorgvinsson, submitted a report to the Board recommending that

Matthew receive continued hospitalization at Menninger, opining that Matthew's educational issues were inextricably interrelated with his mental health issues.  On October 25, 2004, however, the IEP team recommended that Matthew be placed in a private day school outside any hospital setting.

Accordingly, Matthew applied for and was accepted for admission at the Lodge School in Gaithersburg, Maryland, a private special education day school which provides a therapy-integrated environment.  Matthew began attending Lodge on December 6, 2004.  According to a report by his homeroom teacher, on the occasions when Matthew attended school, he appeared to be on task and to perform to the best of his ability.  His attendance, however, was highly erratic.  Between December 2004 and March 2005, he was present for his entire half-day school session on 10 occasions, but was late 19 times and had 61 unexcused absences. Not only did he miss class, he missed several therapy sessions, which were attended instead by his mother.

Matthew received almost no therapy at Lodge.  Instead, his parents arranged for him to receive services privately from the Behavior Therapy Center (BTC) located in Silver Spring, Maryland.  BTC attempted to reduce Matthew's severe avoidance behavior, excessive washing activities, bizarre verbalizations about being an alien, and oppositional and aggressive behavior, but the treatment did not address Matthew's education.  BTC eventually concluded that treatment at a residential facility equipped with more restrictive environmental controls was imperative for Matthew to progress, in particular a facility that could enforce school attendance.

On May 4, 2005, the Board convened another IEP team meeting.  Given Matthew's failure to attend Lodge, both the Griffins and the staff from Lodge agreed that he required a different program.  On May 15, 2002, Mrs. Griffin wrote to the Board in support of her request that it fund Matthew's return to Menninger, but on May 24, 2005, the IEP team again recommended that

Matthew attend a separate public day school program, referring him this time to the Regional Institute for Children and Adolescents (RICA) in Rockville, Maryland.  RICA, however, rejected Matthew, at which point the Board sought his placement at a number of other private day schools.

On July 18, 2005, the Griffins requested a due process hearing seeking to require the Board to fund a return to Menninger.  Meanwhile, in September 2005, Matthew was accepted at The Jefferson School and at the Forbush School, therapeutic day school programs, both of which the Board deemed appropriate to Matthew's needs.  The Griffins, however, took the position that neither of these schools addressed all of Matthew's needs and rejected them.  While the Board concedes that neither school was capable of providing Matthew with the medical treatment required to stabilize his OCD, it claims that either school was able to provide him with a program appropriate to his educational needs.

In his decision following the due process hearing, the ALJ ordered that the Board pay for the majority of the costs of Matthew's stay at Menninger, including tuition, room and board, all non-medical related services and costs, and medical costs related to his diagnosis and evaluation.  The ALJ concluded *inter alia* that, "Menninger has been the only place in [Matthew's] life where he made progress with his OCD while accessing his education.  The treatment was succeeding . . . ."

## II.

In *Board of Education v. Rowley*, the Supreme Court established that, in reviewing administrative decisions in IDEA cases, the district court must make an independent decision based on a preponderance of the evidence, while giving due weight to the state administrative proceedings. 458 U.S. 176, 206 (1982).  In *Doyle v. Arlington County School Board,* the Fourth Circuit elaborated on the "due weight" requirement.  953 F.2d 100 (4th Cir. 1992).  Due weight must be accorded to

the findings of fact of the hearing officer, which are entitled to a presumption of *prima facie* correctness, while the district court, if it is not going to follow those findings, must explain why. *Id.* at 105.  The district court may consider the entire record developed below as well as any additional evidence presented in the district court itself.  20 U.S.C. § 1415(i)(2)©.

## III.

Under the IDEA, children with disabilities are assured a "free appropriate public education" ("FAPE").  20 U.S.C. § 1412(1).  The goal of the IDEA is that each child should receive an education appropriate to his or her unique needs, although this does not necessarily mean entitlement to an education that maximizes individual potential.  *Bd. of Educ. v. Rowley*, 458 U.S. at 199.  Moreover, the IDEA distinguishes between the child's educational needs, as to which the Act insures funding, and the child's medical needs, which are ordinarily the financial responsibility of the child's parents.  *See Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, 903 F.2d 635 (9th Cir. 1990).

That distinction lies at the heart of this case.  The Griffins argue, and the ALJ found, that Matthew's educational and psychiatric needs are inextricably intertwined such that the Board must bear full responsibility for a placement that will address both Matthew's educational and psychiatric needs.  In contrast, the Board argues that Matthew's educational needs are clearly segregable from his medical or psychiatric needs and that his educational needs on their own do not warrant placement in a residential psychiatric hospital.

While this is the principal issue before the Court, the parties have raised two other issues that the Court addresses preliminarily.  First, the Board argues that the ALJ committed error by admitting and relying upon the telephonic testimony of Dr. Thröstur Bjorgvinsson, one of Matthew's doctors

at Menninger.  Second, the Griffins argue that the Board has not met its burden to engage in interagency planning in order to pursue other options for Matthew.

**IV.**

At the administrative hearing, over the Board's objection, the ALJ allowed telephonic testimony of Dr. Bjorgvinsson of Menninger.  Relying on two unreported decisions from the United States District Court for the Eastern District of Michigan, the Board asserts that the ALJ's decision to allow this is contrary to the plain language of the IDEA.  The Board also contends that Maryland's regulation allowing telephonic testimony in administrative hearings falls below the floor set out in the IDEA, which is impermissible.[2]

The Court concludes that allowing the telephone testimony was a proper exercise of discretion.

20 U.S.C. § 1415 establishes procedural safeguards governing administrative hearings under the IDEA.  Among others, each party "shall be accorded . . . the right to present evidence and confront, cross-examine, and compel the attendance of witnesses."  20 U.S.C. § 1415(h)(2).  The Maryland Office of Administrative Hearings allows an administrative law judge to conduct "all or part of the hearing by telephone" if a party "does not object *and* establish[es] good cause for the objection."  Md. Regs. Code tit. 28, §02.01.17B(1) (emphasis added).[3]

---

[2]

The Board is correct that a state may not fall below the basic floor established by federal regulation.  *See Town of Burlington v. Dept. of Educ.*, 736 F.2d 773, 781 (1st Cir. 1984).

[3]

The regulation provides in full:  "If a party does not object and establish good cause for the objection, the judge may conduct all or part of the hearing by telephone or other similar audio electronic means, if each participant in the hearing has an opportunity to participate in and hear the entire proceeding."

Insofar as the Court can tell, no published case specifically addresses the matter of telephonic testimony in relation to the IDEA.  The Court therefore begins by considering the propriety of such testimony in other contexts.

In criminal cases, the Sixth Amendment's Confrontation Clause, which provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him," reflects the importance the judicial system places on live testimony.  U.S. Const. amend VI.  In-person testimony allows the factfinder to judge the truthfulness of a witness from not only his words, but from his demeanor as well.  *See Crawford v. Washington*, 541 U.S. 36, 43-44 (2004) (explaining how Confrontation Clause was designed to remedy abuses in which criminal defendants were tried on the basis of out-of-court statements in lieu of live testimony, such as during the trial of Sir Walter Raleigh, who reportedly demanded as to the witness against him, "let Cobham be here, let him speak it.  Call my accuser before my face").  The ability to judge witness credibility, however, is more critical in criminal trials where the liberty of the defendant is at stake.  As the stakes faced by a defendant, so to speak, decrease, so does the need for live confrontation.  Accordingly, the right of confrontation has been found inapplicable in a variety of criminal proceedings that fall short of trial.  *See United States v. Venson*, No. 98-4410, No. 98-4411, 1999 U.S. App. LEXIS 2852 (4th Cir. Feb. 24, 1999) (post conviction sentencing), *United States v. Hamilton*, 107 F.3d 499 (7th Cir. 1997) (competency hearing), *United States v. Sunrhodes*, 831 F.2d 1537 (10th Cir. 1987) (restitution hearing), *State v. Aldape*, 307 N.W.2d 32 (Iowa 1981) (suppression hearing).

In any event, it is well established that the right of confrontation does not apply to civil or administrative proceedings.  *See, e.g. Peretti v. Nat'l Transp. Safety Bd. Fed. Aviation Admin.*, No. 92-9562, 1993 U.S. App. LEXIS 16132, *5 (10th Cir. July 1, 1993) (finding the right of

confrontation inapplicable "in the present administrative, i.e. civil context"). On the other hand,

insofar as the Fifth Amendment right of due process must still be satisfied, a party is guaranteed at

least some level of protection. *See, e.g., United States v. Baker*, 45 F.3d 837, 842-43 (4th Cir. 1995)

(determining that respondent was not entitled to the constitutional rights of a defendant in a criminal

trial because commitment hearings are civil matters protected by due process)*; United States v.*

*McDonald*, 55 M.J. 173, 174 (C.A.A.F., 2001) (holding the Sixth Amendment's Confrontation

Clause invalid, but applying the Fifth Amendment's Due Process Clause to the pre-sentencing

portion of a non-capital court-martial).

Federal Rule of Civil Procedure 43(a) specifically addresses the nature of live testimony in

civil trials. It provides:

> In every trial, the testimony of witnesses shall be taken in open court, unless a federal law,
> these rules, the Federal Rules of Evidence, or other rules adopted by the Supreme Court
> provide otherwise. The court may, for good cause shown in compelling circumstances and
> upon appropriate safeguards, permit presentation of testimony in open court by
> contemporaneous transmission from a different location.

Fed. R. Civ. P. 43(a). Accordingly, several courts have invoked Rule 43(a) to admit telephonic

testimony. *See, e.g., United States v. Beaman*, 322 F. Supp. 2d 1033, 1033 (D.N.D. 2004) (allowing

testimony to be taken via live video teleconferencing where witness could not appear in person

because he was subject to subpoenas in two previous criminal cases)*; Dagen v. CFC Group*

*Holdings Ltd., ET.*, No. 00-Civ. 5682, 2003 U.S. Dist. LEXIS 20029 (S.D.N.Y. Nov. 7, 2003)

(allowing telephonic testimony of five employee witnesses from Hong Kong because of cost,

international travel issues and business concerns). Indeed, allowing telephonic testimony is far from

unusual in today's technologically advanced society. *See e.g., United States v. Gigante*, 971 F.

Supp. 755, 758 (E.D.N.Y. 1997) ("[F]ederal trial courts have repeatedly, in civil cases, taken

testimony by telephone and closed circuit television.  The jury has never had any difficulty in evaluating such testimony"), *Dagen*, 2003 U.S. Dist. LEXIS 20029, at *3 ("[T]he court is not persuaded that allowing telephonic testimony is so extraordinary").

The Court is unable to see how telephonic testimony would be less appropriate in administrative hearings.  Indeed, the State of Maryland has chosen to routinely permit such testimony.  *See* Maryland Office of Administrative Hearings, "Frequently Asked Questions," http://www.oah.state.md.us (last visited June 11, 2007) ("If you would like all or part of your hearing conducted by telephone or videoconference, contact the docket specialist listed on your hearing notice").  Moreover, like Fed. R. Civ. P. 43(a), Md. Regs Code tit. 28 § 01.02.17B(1) allows telephonic testimony, differing from the Federal Rule only in that it requires good cause *not* to allow telephonic testimony.  The real question is whether this distinction ultimately makes any difference.

The Court considers the two unreported cases cited by the Board to the effect that the IDEA requires in-person testimony.  In *Walled Lake Consolidated Schs. v. Jones*, the U.S. District Court for the Eastern District of Michigan denied the use of telephonic testimony on the sole grounds that "20 U.S.C. § 1415(d) affords many of the safeguards of a trial."  24 IDELR 738, 739 (E.D. Mich. 1996).  The Court finds this reasoning unpersuasive.  An administrative hearing is essentially a civil proceeding as to which no constitutional right of confrontation obtains.  On a showing of good cause and with appropriate safeguards – whether good cause must be shown to permit the electronic transmission or to preclude it – there is no reason why an administrative proceeding should not have the same flexibility as an ordinary civil trial does.  Nor is it self-evident that "while cross-examination may be possible via telephone, when the right to cross-examination is coupled with the right to confront, it must mean face-to-face," as suggested in *Farmington Public Schs. v. Lenhoff*,

No. 89-CV-70323-DT, 1989 U.S. Dist. LEXIS 17801 (E.D. Mich. May 25, 1989). Due process can be satisfied at the administrative level by convening the parties and the witness by telephone or by such other means as video conferencing, allowing for direct testimony and providing for cross-examination. Insofar as the witness's demeanor cannot be observed when testimony is given telephonically, while there may be some instances where that becomes a critical factor, it seems highly doubtful in the IDEA setting that the testimony of an expert physician will stand or fall on whether his eyes shift suspiciously or sweat breaks out on his forehead.[4]

In this case, the ALJ concluded and the Court agrees that good cause was shown for allowing Dr. Bjorgvinsson to testify by telephone. He was located in Texas; the hearing took place in Maryland.[5] His total testimony took no more than a few hours. The cost of insisting upon his in-person presence far outweighed any benefit. Adequate safeguards were implemented. Dr. Bjorgvinsson was properly sworn and was subject to cross-examination. *See e.g., Sunrhodes*, 831 F.2d at 1544 (10th Cir. 1987) (proceeding deemed fair and accurate where witness testifying by phone was placed under oath and subject to immediate cross-examination), *Aldape*, 307 N.W.2d at

---

[4]

    In fact, as one court has pointed out, "hearing examiners can effectively judge credibility over the phone by noting voice responses, pauses, levels of irritation and other factors. Moreover, one survey shows that 82% of examiners who have presided over telephone hearings believe that they can properly judge credibility and that the procedure comports with due process." *Casey v. O'Bannon*, 536 F. Supp. 350 (E.D. Pa. 1982) (*citing* Attitudes Towards the Use of the Telephone in Administrative Fair Hearings, The California Experience, 31 Administrative Law Review 247 (1979)).

    Even the Eastern District of Michigan, the very court which struck down telephone testimony in IDEA cases, agrees that "the Hearing Officer may be able to properly judge the credibility of the witnesses through telephone testimony." *Walled Lake,* 24 IDELR at 739.

[5]

    The Court takes judicial notice of the distance between the two states, approximately 1,400 miles.

43 (Iowa 1981) (trial court had sufficient basis for evaluating the truthfulness of two witnesses providing telephonic testimony because they were properly sworn and thoroughly cross-examined). The Board, moreover, stipulated to the doctor's expertise in clinical psychology, with an emphasis in diagnosis and treatment of adolescent OCD.  Indeed, the Board makes no suggestion of bias or untruthfulness on the witness's part – considerations which might have called for up-close visual observation during testimony.  At most, the Board has expressed suspicion regarding Dr. Bjorgvinsson's testimony that Matthew's medical and educational needs were "inextricably intertwined," noting that it is "interesting that doctors just happen to use . . . lawyer language" and that one might ask "where Dr. Bjorgvinsson decided that he should use words like that."  This sounds a lot like Captain Renault's shock at finding that gambling was going on in Rick's café – lawyers coaching witnesses, indeed!  The fact that Dr. Bjorgvinsson testified by telephone rather than in-person had no bearing on the words he chose, particularly in that counsel for the Board was free to cross-examine on his choice of terms.

All indicators in this case overwhelmingly point to the propriety of Dr. Bjorgvinsson's telephonic testimony. While there may be instances in IDEA proceedings where live in-person testimony will be appropriate, in this day and age, the tilt is undoubtedly in favor of more, rather than less, distance testimony.[6] The ALJ committed no error in allowing telephone testimony in this case.

## V.

---

[6]

Indeed, even one of the cases cited by the Board attests to the positives presented by the use of telephonic testimony: "It also seems that in cases such as this one, telephone testimony would not penalize the Plaintiff, would be advantageous and economical to the Defendants and result in the 'meaningful opportunity to be heard' required in due process hearings."  *Walled Lake,* 24 IDELR at 739.

The Court next considers the Griffins' allegation that the school system violated state law by failing to participate in interagency collaboration, in consequence of which it is supposedly obliged to fund Matthew's private placement.  The Court finds this argument meritless.

Under Maryland law, "A local school system shall establish and maintain interagency planning and program implementation agreements for students with disabilities in the manner specified by the [Maryland State] Department [of Education] or Article 49D, Annotated Code of Maryland."  Md. Regs. Code tit. 13A § 05.02.13(B).  As the Board points out, the regulation cited addresses the establishment and maintenance of interagency agreements; it does not provide standards for implementation of those agreements, referring instead to other sources to establish such standards.  Indeed, the Griffins have provided no evidence of violations of Maryland State Department of Education directives, nor have they pointed to any provision of Article 49D of the Annotated Code of Maryland that supports their claim.  The conspicuous absence of any specificity with regard to any violation may be explained in part by the apparent absence in the Code of any affirmative obligation on the Board to initiate interagency planning.  Though various sections of Article 49D establish the composition of state and local coordinating councils that have the power to review residential placements for children, there is nothing to suggest that a school board's execution of this interagency planning and collaboration creates any obligation as to a particular disabled child.  *See* Md. Code Ann. Art. 49D, §§ 4-101, 4-102.  Thus, while the possibility of interagency planning may still be worthwhile with regard to Matthew, the Board cannot be required to fund his residential treatment simply because there may have been a lack of interagency collaboration.

## VI.

The Court turns to the primary issue in this case: Whether Matthew needs to be placed in a residential facility and, if so, the extent to which the Board is responsible for funding that placement. The Court does not understand the Board to be arguing that Matthew does not require a residential placement, only that the residential placement is necessary to deal with Matthew's severe psychiatric condition, not for any educational issues he may face.

## A.

Pursuant to 34 C.F.R. § 300.104, "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." In order for the school system to be responsible for the residential placement, there must be an intimate connection between the residential placement and the special educational needs of the child. *See Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990) ("If the educational benefits which can be provided through residential care are essential for the child to make *any* educational progress at all, then residential care is required"). The key determination is whether the need for the residential placement is "segregable" from the disability or whether the medical and educational needs are "intertwined." *See id.* Where "residential placement is necessitated by medical, social, or emotional problems that are segregable from the learning process," the school system is not responsible for funding a residential placement. *Id.* On the other hand, in those situations in which the educational need clearly stems from the same source as the disability, the various issues resulting in the overall need for a residential placement are at least so intertwined with other needs that they cannot be separated and the school system is responsible for residential placement. *See North v. D.C. Bd. of Educ.*, 471 F. Supp. 136, 141 (D.D.C. 1979). It is only where medical and educational

needs are truly incapable of separation that residential services should be considered "an essential prerequisite for learning." *Kruelle v. New Castle County Sch. Dist.,* 642 F. 2d 687, 694 (3rd Cir. 1981).

The ALJ concluded that Matthew's "educational and mental health issues are inextricably intertwined" and therefore that the residential placement is necessary to provide Matthew special education and related services. Accordingly, the ALJ directed that the Board pay for all the costs listed under the regulation (as well as for additional costs comprising "related services," which will be discussed presently). The Court accepts the ALJ's first order findings of fact as *prima facie* correct, but rejects his ultimate conclusion that Matthew's educational and psychiatric needs cannot be separated.

In arguing that residential placement for Matthew is required only to treat his medical and psychiatric needs, the Board points to the fact that he has consistently been found to be of above average intelligence and therefore educable. The Griffins counter that Matthew's OCD is so severe that he cannot avail himself of education without the treatment provided by Menninger's program. The Griffins cite *Township of Bloomfield Bd. of Educ. v. T.M.,* in which the court held that a student's situation constituted a "continuing, interrelated process in which his psychological difficulties and his education continue in tandem" such that in order to make the student "available for learning," a residential placement was necessary. No. Civ. 04-3725(DRD), 2005 WL 2320029, at *10 (D. N.J. Sept. 22, 2005 ).

While it may be true, as the ALJ found, that "Matthew is too ill to educate at this time," the severity of Matthew's illness does not necessarily compel the conclusion that his placement at Menninger is for educational reasons. Matthew's OCD affects all aspects of his life; he cannot get

on with daily living unless his psychological deficits are addressed.  Yet when he can address his OCD symptoms and is able to attend class, with his above average intelligence, he has shown that he is capable of at least some learning.

Moreover, even if Matthew's needs were more education-based than they appear to be, Menninger is not an educational facility.  It is not Menninger that provides Matthew the educational services he currently receives but, as the Board points out, it is the Spring Branch Independent School District, which essentially comes to the Menninger campus to provide instruction to Menninger's patients.  This arrangement is significantly different from residential facilities that provide an integrated program of both educational and other supportive services.  The present case is not entirely dissimilar from one in which Matthew might be put on a bus to attend school in the Spring Branch Independent district.

The fact that Menninger in effect contracts out its educational services in the Court's view highlights Menninger's role as a psychiatric hospital, rather than the type of residential school contemplated by the IDEA and the regulation governing residential placements.  Indeed, as in *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, the *educational* services provided by the Spring Branch Independent School District are those envisioned by the IDEA itself.  903 F.2d at 647.  The IDEA defines the term "special education" to mean "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including--(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings . . . ." 20 U.S.C. § 1401(29).  Though the costs of such instruction are clearly covered under the IDEA, as the *Clovis* Court noted, "the absence of educational services provided by [the hospital] indicates that the room and board were medically as opposed to educationally related" and further that the

residential placement regulation "does not require school districts to pay the costs of a child's room and board . . . at a hospital." 903 F.2d at 647.

As the *Clovis* Court also noted, there is nothing "magical" about the appellation 'hospital;' the focus of the court should be on the function the facility serves. *See id.,* 903 F.2d at 646 ("We note that there is nothing magical about the appellation 'hospital' in our analysis. There are many public institutions around the nation which are called "state hospitals" that are in fact primary residential treatment facilities where the educational, social and developmental training needs of severely handicapped individuals are met . . . These institutions are not primarily medical hospitals, but are more like residential treatment centers where an individual's multiple and intertwined needs can be met"). The Court does not agree with the ALJ's finding that Menninger is a "therapy integrated placement in a residential setting." Matthew's placement at Menninger is fundamentally in response to his psychiatric condition. And because his residential placement is not "an essential prerequisite for learning," the Board is not responsible for all the costs imposed under 34 C.F.R. § 300.104.

## B.

The Court's finding that Menninger is not the sort of residential placement envisioned by the IDEA or the regulation governing residential placements does not, however, mean that none of Menninger's services are compensable. Even if the Board is not responsible for the cost of the residential placement itself, including the cost of tuition and room and board, it may still be responsible for some costs under the IDEA's definition of "related services."

The term "related services" means "transportation, and such developmental, corrective, and other supportive services (including . . . psychological services, . . . counseling services, . . . medical

services, *except that such medical services shall be for diagnostic and evaluation purposes only)* as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26) (emphasis added).  The reason for excluding most medical services from the definition of related services was to "spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence."  *Clovis*, 903 F.2d at 642.

The Griffins argue that the entire cost of the hospitalization at Menninger is recoverable as a "related medical service" because Matthew is undergoing constant evaluation and diagnosis designed to lead to an appropriate special education program.  Some courts, it is true, have found that the entire cost of a hospitalization can be recovered as a "related service."  *See, e.g., Dept. of Educ., State of Hawaii v. Carrie Rae S.,* 158 F. Supp. 2d 1190, 1200 (D. Hawaii 2001); *T. v. San Francisco Unified Sch. Dist.,* 553 F. Supp. 1107, 1118 (N.D. Cal. 1982).  On the other hand, a number of courts have found to the contrary.  *See, e.g., Butler v. Evans,* 225 F.3d 887, 893-94 (7th Cir. 2000), *Salley v. St. Tammany Parish Sch. Bd.,* 57 F.3d 458 (5th Cir. 1995).

The Board argues that Matthew's diagnosis is long-standing and well-established and that Menninger provides treatment, not diagnosis.  Still, the Board has elsewhere implicitly acknowledged that there is a psychological component to the educational goals set for Matthew.  His May 4, 2005 IEP from The Lodge School, for example, which by its nature is designed to contain only educational goals and objectives, recognizes that "severe emotional issues significantly impact Matthew's ability to access the curriculum."  To address those needs, The Lodge School set certain goals for Matthew such as "protecting [him]self from psychological or physical harm in an appropriate manner" and "distinguishing real from imagined situations." Certainly some evaluation

by medical professionals as to how such educational goals might be achieved would seem to be involved.

The question is whether the Court is obliged to take the all-or-nothing approach advocated by the parties.  To suggest that the entire hospitalization may be recoverable as a "related service" would effectively wipe out the regulation's distinction between medical services for treatment and medical services for diagnosis and evaluation.  *See Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 892 (noting that as to the "medical services" exclusion, "the Secretary could reasonably have concluded that it was designed to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence").  On the other hand, to suggest that Matthew is not undergoing at least some diagnosis and evaluation with an eye toward his education programming disregards key evidence in the record before the Court.

In *Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, the Supreme Court recognized that the essential purpose of a "related service" is to "enable a disabled child to remain in school during the day [to] provide the Student with the 'meaningful access to education that Congress envisioned.'" 526 U.S. 66, 73 (1999).  The Court believes this is exactly the kind of service that Menninger provides to Matthew.  Menninger's November 27, 2006 report on Matthew's progress, submitted by counsel and accepted by the Court as additional evidence,[7] illustrates how the relationship

---

[7]

The report was offered as additional evidence by the Griffins following oral argument.  In response, counsel for the Board has moved to strike the supplemental memorandum and the accompanying evidence as beyond the scope of the further briefing the Court invited at oral argument.  Alternatively, the Board asked that its own additional evidence be considered by the Court.  The Court DENIES the Board's request to strike the supplemental memorandum and evidence.  The Court ACCEPTS the additional evidence provided by the parties as "evidence concerning relevant events occurring subsequent to the administrative hearing." *Burlington v. Dept. of Educ.,* 736 F.2d 773, 790 (1st Cir. 1984); *see also* 20 U.S.C. § 1415(i)(2)(C)(ii) ("the court . . . shall hear additional evidence at the request of a party").

between Menninger and the local school district has provided Matthew with accommodations that have allowed for improvement not only in his OCD symptoms, but in his education.  Menninger staff, for example, have worked closely with school officials to evaluate Matthew's difficulties in algebra and to create strategies to enable him to answer questions for which there may be more than one answer.  Staff have reported that their "ability to collaborate with the on campus school" allows them "to address Matthew's OCD/PDD symptoms that interfere with his school participation."  They report that Matthew would not even make it to school without the efforts of the staff and the use of his specialized bed.  Moreover, there is evidence that the Menninger staff are working with Matthew to customize behavior plans to enable him to more easily access his education.  For instance, he receives hourly reinforcement for following school rules.  These services are precisely the sort needed to assist Matthew to remain in school during the day and to provide him with the "meaningful access to education that Congress envisioned," as the Supreme Court stated in *Garret F.*  526 U.S. at 73.  They are, in other words, "related services" under 20 U.S.C. § 1401(26).

## C.

In sum, while the Menninger hospitalization itself is not covered under the regulation for residential placements, certain services provided by Menninger are compensable as "related services."  *See Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1209 (4th Cir. 1990) ("[T]he education services Matthew received at the Blue Ridge Center, and much of the counseling he received while hospitalized, may be recoverable even though the medical expenses during the hospital stay are not"); *Doe v. Anrig*, 651 F. Supp. 424, 430-32 (D. Mass. 1987) (granting reimbursement of educational expenses incurred during a psychiatric hospitalization while denying reimbursement for the hospitalization itself).  The matter of apportionment remains.

Following oral argument, the Court invited counsel to submit briefing as to its authority to fashion a remedy that would apportion the costs between the parties, which the parties seem to agree the Court is authorized to do.  Unfortunately, the parties have provided little guidance as to how the Court might allocate costs between those associated with Matthew's psychiatric care and those associated with his education.  Menninger apparently insists that it is "unable" to break down the various costs of Matthew's care.  Indeed, the Board's contract with Menninger declares that "Menninger Clinic will not be responsible for providing itemized bills for the $900.00 per day rate."

The Court, of course, cannot be bound by Menninger's proclaimed inability (or disinclination) to undertake an allocation.  Under the IDEA, a district court may "grant such relief as it determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).  The Supreme Court has held that in fashioning relief, "equitable considerations are relevant" and a district court enjoys "broad discretion."  *Burlington Sch. Comm. v. Dep't. of Educ.,* 471 U.S. 359, 374, 369 (1985).  In the absence of more detailed guidance from the parties, the Court will exercise its equitable powers to set the Board's share of the Menninger costs.

From what the Court can glean from the available documents, the Board is currently responsible for paying 70% of Menninger's daily rate of $900.00; Matthew's parents pay the remainder.[8]  Counsel for the Board notes that, at this rate, the Board is responsible for and has been

---

[8]

The magnitude of this daily payment suggests why the costs of hospitalization were not meant to be covered in circumstances such as these.  *See Clovis*, 903 F.2d at 645-46 ("Clearly hospital care is, and was understood by Congress . . . to be, a far more expensive proposition than an educational residential placement and a greater burden than the states could ordinarily be expected to shoulder in their budgets for education"); *see also Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 16 (1993) ("Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable").

paying almost $230,000.00 per year.  The Court assumes that the $900 daily rate covers room and

board and medications, which have already been excluded either by the Court's analysis or by the

IDEA itself, as well as diagnostic assessments and meetings and the on-site school program.  These

latter costs are compensable as "related services" and the on-site school program is compensable as

direct "special education."  All things considered, the Court finds it reasonable to conclude that one-

third of Matthew's costs at Menninger, which is to say $300 per day, are related to education.  This

apportionment will still result in the Board paying approximately $109,500 in yearly costs, a very

substantial sum.  This cost division shall apply retroactive to the start of Matthew's second

placement at Menninger, such that the Griffins shall be responsible for reimbursing the Board for

any costs it may have paid in excess of this allocation.

## VII.

For the foregoing reasons, the Board's Motion for Summary Judgment [Paper No. 16] is

**GRANTED IN PART and DENIED IN PART**.  The Griffins' Cross-Motion for Summary

Judgment [Paper No. 21] is similarly **GRANTED IN PART and DENIED IN PART**.  A separate

Order **SHALL ISSUE.**


                                    _____/s/_____
                                              **PETER J. MESSITTE**
**June 11, 2007**                      **UNITED STATES DISTRICT JUDGE**